UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | 4:25-CR-40098-KES |
| Plaintiff, | |
| | ORDER ADOPTING REPORT & |
| vs. | RECOMMENDATION AS MODIFIED |
| | AND DENYING MOTION TO SUPPRESS |
| BRYAN PATRICK DOUGHERTY, | |
| Defendant. | |

Defendant, Bryan Patrick Dougherty, is charged with one count of

possession of a firearm by a person under indictment, in violation of 18 U.S.C.

§§ 922(n) and 924(a)(1)(D). Docket 1. Dougherty moves to suppress all evidence

obtained during a pat-down search of his person and all evidence obtained as fruit

of the search, including a Smith & Wesson pistol. Docket 28. Dougherty argues

that law enforcement conducted a *Terry* stop without reasonable suspicion and

that the search of his person was also conducted without reasonable suspicion.

*Id.*; *see* Docket 29.

The court referred Dougherty's motion to Magistrate Judge Veronica L.

Duffy under 28 U.S.C. § 636(b)(1)(B). After holding an evidentiary hearing,

Magistrate Judge Duffy recommended denying Dougherty's motion to suppress.

Docket 41 at 17. Dougherty filed objections to the Report and Recommendation,

Docket 48, and the government responded to those objections, Docket 50. After a

de novo review of the Report and Recommendation and the record, the court

adopts the Report and Recommendation as modified below and denies Dougherty's motion to suppress.

## LEGAL STANDARD

This court's review of a magistrate judge's report and recommendation is governed by 28 U.S.C. § 636 and Rule 59 of the Federal Rules of Criminal Procedure. The court reviews de novo any objections to the magistrate judge's recommendations with respect to dispositive matters that are timely made and specific. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b). Because motions to suppress evidence are considered dispositive matters, a magistrate judge's recommendation regarding such a motion is subject to de novo review. 28 U.S.C. § 636(b)(1); *see also United States v. Raddatz*, 447 U.S. 667, 673 (1980). In conducting a de novo review, this court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994).

## FACTS

After a de novo review of the transcript of the evidentiary hearing and the exhibits received into evidence, the court makes the following factual findings:

On October 10, 2024, at approximately 9:43 p.m., a report came in over the police radio that a shooting had occurred at the Kum & Go gas station, located at 41st Street and Sertoma Avenue in Sioux Falls, South Dakota. Docket 38 at 6-7. According to the report, multiple people were involved in the shooting, baseball bats were present, and an individual had dropped to the ground. *Id.* at 7, 50.

At the time the report came in, Violent Crime Unit (VCU) Detectives John Gross, Nelson Leacraft, and Dirk Anker were in their offices at the Sioux Falls

Police Department. *Id.* at 6-7. Upon hearing the report, Detectives Gross and Leacraft determined that they would respond to the call and began to put on their gear. *Id.* at 7, 28. At the same time, Detective Anker pulled up a live feed from the traffic cameras at 41st Street and Sertoma. *Id.* at 7-8, 79. The live feed consisted of four different camera views each facing a different direction. *Id.* at 8. While they were putting on their gear, both Detectives Gross and Leacraft periodically looked over Detective Anker's shoulder to view the live feed. *Id.* at 8-9, 29, 52. Detective Leacraft explained that he "was throwing [his] gear on and [was] just briefly looking over his shoulder between getting ready." *Id.* at 9. Detective Anker testified that at one point, Detective Gross came over to Anker's desk to watch the live feed. *Id.* at 95-96. Detective Anker also updated both Detectives Gross and Leacraft on what was happening on the live feed. *Id.* at 9, 35, 52.

The detectives testified that multiple individuals began running away from the Kum & Go following the shooting. *Id.* at 8, 31 (Detective Leacraft testifying that he remembered "seeing multiple people leave the area of the Kum & Go, running across the street"). One individual ran towards the Get-N-Go gas station located diagonally across the street from the Kum & Go. *Id.* at 8, 52; *see also* Docket 37 at 2. This same individual later fell down in the Get-N-Go parking lot. Docket 38 at 8, 34, 64-66 (Detective Gross testifying that he remembered seeing one individual running from the Kum & Go to the Get-N-Go and later falling down); *see also* Docket 36-D at 0:01-1:27. Both Detectives Leacraft and Gross denied having any knowledge as to what this individual was wearing or what this individual looked like, Docket 38 at 9, 46, 53, but both detectives testified that they saw the individual fall down in the parking lot on the live feed, *id.* at 43, 45-46, 52-53; *see*

*also id.* at 93-95 (Detective Anker testifying that he told both Detectives Leacraft and Gross about an individual falling down in the Get-N-Go parking lot).

Approximately one to two minutes after the report came in, Detectives Gross and Leacraft left in their patrol vehicle. *Id.* at 10, 52. While en route, they received additional updates over the radio from other responding officers. *Id.* at 9. These updates included reports on the status of victims found at the scene and a description of a potential suspect, described as a "female, Hispanic or Indian female shooter." *Id.* at 11. Detective Leacraft testified that he did not hear this description of the suspect because the patrol vehicle engine and sirens were noisy and he was busy helping Detective Gross navigate to the scene. *Id.* at 11, 13, 38-39. Detective Gross also testified that he did not recall hearing anything specific from the radio updates. *Id.* at 54.

About eight minutes after leaving police headquarters, the detectives arrived at the intersection of 41st Street and Sertoma. *Id.* at 13. Detectives Gross and Leacraft decided to first go to the Get-N-Go because the Kum & Go already had several squad cars, a firetruck, and paramedics responding to the scene. *Id.* at 13, 55. The detectives also chose to look for potential victims, suspects, or witnesses at the Get-N-Go because they had previously seen multiple individuals crossing the street toward the Get-N-Go and had seen an individual fall down in the Get-N-Go parking lot. *Id.* at 13-14, 55; *see also* Docket 36-4 at 8:04-10.

Detective Gross testified that he drove the patrol vehicle into the Get-N-Go's southwest entrance and ultimately parked the vehicle "kind of [in] the center of the parking area, between the business and the gas pumps." Docket 38 at 55; *see also* Docket 37 at 1. Detective Gross turned off the patrol vehicle's sirens prior to

entering the Get-N-Go parking lot but did turn on the amber lights for other
drivers' awareness after he parked the vehicle. Docket 38 at 27, 56. Detective
Gross testified that Detective Leacraft pointed out an individual, later identified as
Dougherty, that he wanted to speak with first. *Id.* at 55.

Upon exiting the passenger side of the patrol vehicle, Detective Leacraft
approached Dougherty, who was leaning against the wall in front of the main
entrance of the Get-N-Go. *Id.* at 15, 17; Docket 37 at 1; Docket 36-3 at 0:35. Both
detectives testified that upon leaving the patrol vehicle, they were about 20 feet
away from Dougherty. Docket 38 at 17, 58. Detective Leacraft testified that he
chose to approach Dougherty, as opposed to the other people standing nearby,
based on his age and attire and because Dougherty "was looking directly over to
the Kum & Go area." *Id.* at 15-16. Detective Leacraft testified that Dougherty was a
younger male who was wearing "a stocking cap and a big kind of puffy jacket,
[and] some black pants," which he noted was "interesting" because it was "fairly
warm" that evening. *Id.* at 15. Detective Leacraft also testified that in the months
leading up to this incident, he was aware of "multiple weapons violations in gas
station parking lots, or car meet-up situations where subjects had pulled guns or
actually discharged them. They were all kind of younger males and then dressed in
a similar fashion." *Id.* at 16. Thus, Detective Leacraft testified that Dougherty was
"like someone that might have been involved in [the shooting at the Kum & Go],
given his age and the style of dress." *Id.*

Upon approaching Dougherty, Detective Leacraft pointed his flashlight at
Dougherty, illuminating his chest and face. Docket 36-3 at 0:40; Docket 38 at 18
(Detective Leacraft testifying that he shined his flashlight on Dougherty "to see if

5

he was injured or anything"). Detective Leacraft positioned himself directly in front of Dougherty slightly to the right. Docket 36-3 at 0:42. Detective Gross testified that after getting out of the patrol vehicle, he scanned the area before joining Detective Leacraft with Dougherty. Docket 38 at 55-56. Detective Gross remembered standing about five feet from Dougherty, slightly to Dougherty's left. *Id.* at 58; *see also* Docket 36-3 at 0:53.

Detective Leacraft first asked Dougherty "how's it going?" before asking Dougherty if he had seen anything concerning the incident at the Kum & Go. Docket 36-3 at 0:41-43; *see also* Docket 38 at 16-18. Dougherty responded that he had not seen anything and that he had previously been at the park. Docket 36-3 at 0:43-0:46. Detective Leacraft assumed Dougherty was referring to Kuehn Park, which was only a few blocks away from the Get-N-Go. Docket 38 at 37. Detective Leacraft asked Dougherty if he had come over to the Get-N-Go from the park and Dougherty stated that "Yeah, I ran over here." Docket 36-3 at 0:46-49; *see also* Docket 38 at 19. Detective Leacraft then asked for Dougherty's name, to which Dougherty responded "Bryan." Docket 36-3 at 0:49-51. Detective Leacraft asked if he could get Dougherty's ID. *Id.* at 0:52. Dougherty stated that "I don't have one. Bryan Dougherty." *Id.* at 0:53.

Upon hearing Dougherty's full name, Detective Leacraft testified that he recognized Dougherty's name as being associated with two prior firearm-related offenses. Docket 38 at 20. The first case involved a "drug deal gone wrong" in November of 2023 in which Dougherty had been captured "on video pointing a gun at a car and potentially firing it at the vehicle." *Id.* In the second case, Dougherty had allegedly threatened someone with a handgun in June of 2024. *Id.* at 20-21.

6

When police later stopped the suspect's vehicle that Dougherty was riding in, Dougherty ran from police, was apprehended, and was found to be in possession of a firearm. *Id.* at 20. Detective Leacraft was involved in both incidents. *Id.* at 20-21. Detective Leacraft denied recognizing Dougherty by sight, and it was only upon hearing his full name that he made the connection to the prior firearm offenses. *Id.* at 36.

Detective Leacraft testified that at this point, upon recognizing Dougherty's name and his past association with firearms, he "wanted to make sure that there wasn't a gun in play as I [Detective Leacraft] was speaking with [Dougherty]." *Id.* at 21. Detective Leacraft then asked Dougherty if he had a weapon on him. *Id.* at 21-22; *see also* Docket 36-3 at 0:56. Dougherty shook his head "no." Docket 36-3 at 0:58. Detective Leacraft stated that he knew Dougherty had been known to carry weapons and "that [Dougherty] just got out." *Id.* at 0:59-1:03. Detective Leacraft then asked Dougherty if he could conduct a pat-down search of his person. *Id.* at 1:05. Dougherty did not verbally refuse the pat-down and instead started to take off his backpack. *Id.* at 1:06. Detective Leacraft testified that because it appeared one of Dougherty's hands "dropped toward his waistband," he grabbed Dougherty's hand. Docket 38 at 22. From Detective Leacraft's bodycam footage, Dougherty, who had items in both of his hands, appeared to use one hand to remove his backpack while his other hand drifted toward his coat pocket. Docket 36-3 at 1:06-1:09. As Dougherty's hand drifts down his body, Detective Leacraft grabs Dougherty's hand and tells him to "keep his hands out of his pockets." *Id.* at 1:10. Detective Gross also stepped in and grabbed Dougherty's other arm. *Id.*; *see also* Docket 38 at 59.

At this point, Detective Leacraft removed Dougherty's backpack and began a pat search. Docket 36-3 at 1:11-19. Detective Leacraft explained to Dougherty that he was conducting the pat search because he had knowledge that Dougherty was recently released on a prior firearm charge, and that a shooting had occurred at the Kum & Go across the street. *Id.* at 1:20. Detective Leacraft asked Dougherty if he was on probation or parole, to which Dougherty responded that he was on bond. *Id.* at 1:30. Detective Leacraft testified that he "started the pat-search but at first made an observation." Docket 38 at 23. Detective Leacraft stated that because Dougherty's hands were above his head, Dougherty's shirt was lifted. *Id.* at 24. With the shirt lifted, Detective Leacraft observed a "clip to an inside-the-waistband firearm holster on the front of his pants." *Id.* Detective Leacraft then patted the exterior of Dougherty's clothing and felt a hard object, which he believed was a firearm. *Id.*; *see also* Docket 36-3 at 1:30-38.

After the firearm was discovered in Dougherty's holster, Dougherty told Detective Leacraft that he didn't do anything wrong. Docket 36-3 at 1:40. Detective Gross then handcuffed Dougherty. *Id.* at 1:43-50; Docket 38 at 24, 59. Dougherty reiterated to Detective Leacraft that he was not involved in the shooting at the Kum & Go across the street. Docket 36-3 at 2:02. Detective Leacraft removed the firearm from Dougherty's person and placed it on the hood of the patrol vehicle. *Id.* at 2:13-32. After receiving *Miranda* warnings, Dougherty told Detective Gross that he had ammunition, marijuana, and some THC cartridges in his backpack. Docket 38 at 60.

Detective Leacraft then contacted Detective Anker to determine if Dougherty had come from Kuehn Park. *Id.* at 25. Detective Anker later confirmed that

8

Dougherty did walk from Kuehn Park to the Get-N-Go. *Id.* at 88. Detective Leacraft also obtained security footage from the Get-N-Go confirming that Dougherty had come to the Get-N-Go from Kuehn Park. *Id.* at 26. The detectives ultimately released Dougherty after determining that he was not involved in the shooting at the Kum & Go but informed him that potential federal charges may be forthcoming relating to the discovery of the firearm. *Id.* at 47, 61.

## DISCUSSION

Dougherty raises six factual objections and three legal objections to the Report and Recommendation. *See* Docket 48. The court first addresses Dougherty's factual objections before turning to his legal objections.

## I.    Factual Objections

Dougherty first objects to the magistrate judge's statement that Detective Leacraft's flashlight "was not shined further up than Mr. Dougherty's chest." Docket 48 at 2 (quoting Docket 41 at 5). After reviewing Detective Leacraft's bodycam footage, the court agrees with Dougherty that the flashlight's beam illuminated Dougherty's face. *See* Docket 36-3 at 00:40. Thus, the objection is sustained, and the Report and Recommendation is modified to clarify that Detective Leacraft's flashlight illuminated Dougherty's chest and face.

Dougherty next objects to the magistrate judge's statement that Dougherty was in Detective Leacraft's "direct line of vision" when he exited the patrol vehicle. Docket 48 at 2-3 (quoting Docket 41 at 4). Dougherty argues that the magistrate judge improperly relied upon Detective Leacraft's bodycam footage for this factual finding as "it is not possible to say from the video what was in Detective Leacraft's 'line of vision' when he exited the patrol car" because his bodycam is attached to

his chest. *Id.* at 3. Dougherty also notes that "it does not appear that Doughtery would have been directly in front of Detective Leacraft when he exited the vehicle [because t]wo other people can be seen close to the patrol vehicle, near where Detective Leacraft exited the vehicle." *Id.* After reviewing Detective Leacraft's bodycam footage, the court agrees with Dougherty. *See* Docket 36-3 at 00:31-37. It is unclear from the bodycam footage if Dougherty was in Detective Leacraft's direct line of vision as he was exiting the patrol vehicle. *See id.* Thus, Dougherty's objection is sustained, and the Report and Recommendation is modified to remove this statement.

Dougherty next objects to the Report and Recommendation's omission "that multiple people on scene were standing near Dougherty looking directly at the Kum & Go." Docket 48 at 3; *see also* Docket 36-3 at 00:35. Dougherty also objects to the Report and Recommendation's omission of "Detective Gross's testimony that it would 'potentially' be common for anyone in the vicinity to be staring at the crime scene, given how much activity there was." Docket 48 at 3 (quoting Docket 38 at 68). After reviewing footage from the patrol vehicle and Detective Leacraft's bodycam footage, the court sustains Dougherty's objection because there were multiple other people at the Get-N-Go looking in the direction of the Kum & Go. *See* Docket 36-3 at 0:35 (Detective Leacraft's bodycam footage); Docket 36-4 at 8:18-24 (patrol vehicle footage). Thus, the Report and Recommendation is modified to include the fact that multiple other individuals were looking in the direction of the Kum & Go and that Detective Gross testified that it would "potentially" be "pretty common for anyone to be staring" in that direction. *See* Docket 38 at 68.

Doughtery next objects to the magistrate judge's finding that "Detectives Gross and Leacraft were standing in such a way [as] to 'leav[e] an opening that Mr. Dougherty could walk through.'" Docket 48 at 3 (quoting Docket 41 at 6). Dougherty notes that Detective Leacraft "stood just in front of Dougherty to his right," and that Detective Gross "stood just in front of him to his left." *Id.* Dougherty argues that while, in theory, the space was "large enough for Dougherty to walk through, the detectives positioned their bodies in a way that would have limited Dougherty's ability to walk away from the encounter." *Id.* at 3-4. After reviewing Detective Leacraft's bodycam footage, it is apparent that Detective Leacraft is directly in front of Dougherty to his right and that Detective Gross was close to Dougherty on his left. *See* Docket 36-3 at 0:42-53. The magistrate judge was correct that there was a gap between the two detectives, *see* Docket 36-4 at 8:56, but because the determination of whether "the detectives positioned their bodies in a way that would have limited Dougherty's ability to walk away from the encounter," *see* Docket 48 at 4, is a legal question, the court will address it below in its analysis of whether the initial interaction between the detectives and Dougherty constituted a consensual encounter or *Terry* stop.

Dougherty next objects to the magistrate judge's finding that Dougherty's "hand drifted down toward his waist," after Detective Leacraft asked Dougherty if he could conduct a pat-down search. Docket 48 at 4 (quoting Docket 41 at 6). Dougherty argues that Detective Leacraft's bodycam footage reveals "that Dougherty used his hand to attempt to put the item he was holding in one of his hands into a pocket." *Id.* Additionally, Dougherty notes that Detective Leacraft refers to Dougherty's pocket. *See id.* After reviewing Detective Leacraft's bodycam

11

footage and hearing Detective Leacraft tell Dougherty to keep his hands away from his pocket, *see* Docket 36-3 at 1:10, the court finds that it is more precise to say that Dougherty's hand drifted down his body. Thus, the court sustains Dougherty's objection, and the Report and Recommendation is modified to reflect that Dougherty's hand drifted down his body when Detective Leacraft asked to conduct a pat-down.

Dougherty last objects to the Report and Recommendation's statement that "[w]hen asked for his identification, Mr. Dougherty only provided his first name, providing his last name only after being asked a second time." Docket 48 at 4 (quoting Docket 41 at 13). The court agrees with Dougherty. When Detective Leacraft asked for Dougherty's name, Dougherty responded, "Bryan." Docket 36-3 at 00:50. Detective Leacraft then asked, "Can I get an ID from you, man?" *Id.* at 0:51. Dougherty responded "I don't have one. Bryan Dougherty." *Id.* at 0:53. Thus, Dougherty's objection is sustained, and the Report and Recommendation is modified to reflect that Dougherty volunteered his last name without being asked a second time.

## II.    Legal Objections

Dougherty raises three legal objections to the Report and Recommendation. *See* Docket 48 at 5-9. First, Dougherty objects to the magistrate judge's conclusion that the encounter between the detectives and Dougherty was consensual. *Id.* at 5. Second, Dougherty objects to the magistrate judge's conclusion that the detectives had reasonable suspicion to detain Dougherty. *Id.* at 6-7. Third, Dougherty objects to the magistrate judge's conclusion that the detectives had reasonable suspicion

to conduct a pat-down search of Dougherty's person. *Id.* at 8. The court addresses each objection in turn.

A.     **Whether the Interaction Between Dougherty and the Detectives was a Consensual Encounter or a *Terry* Stop**

Dougherty asserts that the interaction between Dougherty and the detectives was not a consensual encounter. *Id.* at 5-6. Dougherty argues that in determining that the encounter was consensual, the magistrate judge improperly relied upon the detectives' subjective intent to explain why they decided to approach Dougherty. *Id.* at 5. Instead, Dougherty argues that because a reasonable person in his shoes would not have felt free to leave upon being approached by both detectives, it was not a consensual encounter, but rather, was a *Terry* stop. *Id.* at 6.

The Fourth Amendment prohibits unreasonable searches and seizures, U.S. Const. amend. IV, but "[n]ot all encounters between law enforcement officials and citizens implicate the protections of the Fourth Amendment," *United States v. Griffith*, 533 F.3d 979, 982-83 (8th Cir. 2008). For instance, consensual encounters between an officer and a private citizen do not implicate the Fourth Amendment. *See United States v. Richards*, 611 F.3d 966, 968-69 (8th Cir. 2010). Thus, "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002); *see also Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("So long as a reasonable person would feel free 'to disregard the police and go about his business' . . . mere police questioning does not constitute a seizure." quoting *California v. Hodari D.*, 499 U.S. 621, 628

13

(1991)). Additionally, an officer may generally ask questions and request an individual's identification without turning the consensual encounter into a seizure. *See, e.g.*, *United States v. Lopez-Mendoza*, 601 F.3d 861, 865 (8th Cir. 2010); *United States v. Granillo*, 288 F.3d 1071, 1075 (8th Cir. 2002).

But a consensual encounter becomes a *Terry* stop "when an officer, by means of physical force or show of authority, has restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 (1968). "There is no bright line between a consensual encounter and a *Terry* stop, rather, the determination is a fact intensive one which turns upon the unique facts of each case." *United States v. Beck*, 140 F.3d 1129, 1135 (8th Cir. 1998). Circumstances that might indicate when an encounter becomes a seizure include:

> officers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation.

*Griffith*, 533 F.3d at 983. In distinguishing whether an interaction is a consensual encounter or a *Terry* stop, "the relevant question is whether, in view of the totality of the circumstances surrounding the incident, a reasonable person would have believed he was free to leave." *United States v. Johnson*, 326 F.3d 1018, 1021 (8th Cir. 2003).

Dougherty concludes that the encounter with the detectives was a *Terry* stop because the manner in which the detectives approached him would signal to a reasonable person that they were not free to leave. Docket 48 at 6. In support of this argument, Dougherty notes the following facts: (1) a patrol vehicle parked approximately 20 feet in front of Dougherty and later flashed its amber lights; (2)

Detective Leacraft bypassed other witnesses and headed directly toward Dougherty after exiting the patrol vehicle; (3) Detective Leacraft shined his flashlight at Dougherty's upper torso and face; and (4) Detective Leacraft positioned himself within arms' reach of Dougherty, and seconds later, Detective Gross positioned himself on Dougherty's opposite side. *Id.* Dougherty argues that "a reasonable person would conclude that the two detectives standing near him or her at opposite sides were limiting the ability to leave the situation." *Id.*

The court finds that based on the totality of the circumstances, the initial interaction between the detectives and Dougherty was a consensual encounter. Detective Leacraft approached Dougherty at a public and fairly busy gas station. Detective Leacraft also used a conversational tone of voice when first speaking with Dougherty. *See, e.g.*, Docket 36-3 at 0:40-56. The detectives did not have their weapons drawn nor is there evidence that either detective threatened, touched, or intimidated Dougherty. *See id.* Additionally, Detective Leacraft initially only asked Dougherty if he had seen anything regarding the shooting at the Kum & Go, and to provide his name and ID. *See id.* Such questions do not equate to a seizure. *See, e.g.*, *Drayton*, 536 U.S. at 200; *Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 117, 185 (2004). Further, there is nothing else to suggest that Detective Leacraft's questions or statements were so "intimidating, threatening or coercive that a reasonable person would not have believed himself free to leave." *United States v. Hathcock*, 103 F.3d 715, 718 (8th Cir. 1997) (internal quotation marks omitted).

Dougherty's main objection to the Report and Recommendation is that a reasonable person would not have felt free to leave based on where the officers were standing and where the patrol vehicle was parked in relation to Dougherty.

15

*See* Docket 48 at 4-6. But it appears that both detectives were standing a normal distance away from Dougherty while conversing with him and his freedom of movement was not blocked to prevent him from walking away from the initial encounter. The detectives' failure to "specifically advise [Dougherty] of his right to walk away," standing alone, "does not elevate the encounter to a seizure, absent some evidence of coercion or restricted freedom." *Hathcock*, 103 F.3d at 718-19; *see also United States v. Vera*, 457 F.3d 831, 835 (8th Cir. 2006) ("There is no *per se* requirement that an officer inform a citizen of his right to refuse consent, and there is no presumption that consent is invalid where given without an explicit notification of the right to refuse."). Because a reasonable person would have believed he was free to leave, the court concludes that the interaction between the detectives and Dougherty was a consensual encounter until the detectives grabbed his arms. As such, Dougherty's objection is overruled.

### B. Whether the Detectives Had Reasonable Suspicion to Conduct a *Terry* Stop

"[T]he Supreme Court held [in *Terry v. Ohio* that] officers may conduct brief investigatory stops of individuals if they have reasonable articulable suspicion of criminal activity." *Griffith*, 533 F.3d at 983-84. "To satisfy the Fourth Amendment, officers must be able to articulate some minimal, objective justification for a *Terry* stop." *Id.* at 984. "In determining whether reasonable suspicion exists, [courts] consider the totality of the circumstances in light of the officers' experience and specialized training." *United States v. Preston*, 685 F.3d 685, 689 (8th Cir. 2012) (internal quotation marks omitted). Courts may also consider such factors as the "time of day or night, location of the suspect parties, and the parties' behavior

when they become aware of the officer's presence." *United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir. 1995).

Dougherty argues that the factors cited in the Report and Recommendation do not support the conclusion that the detectives had reasonable suspicion to detain Dougherty. Docket 48 at 6-7. Dougherty first argues that while it was late, it "was a fairly busy time of night" as there were multiple other people at the Get-N-Go. *Id.* at 7. Dougherty then argues that it was not suspicious that Dougherty was looking in the direction of the Kum & Go because there were several police and emergency response vehicles at the scene and several other people were also looking in that direction. *Id.* Additionally, Dougherty argues that his statement to Detective Leacraft that he "ran" across the street from Kuehn Park is not suspicious as he used the term "colloquially without meaning he literally ran." *Id.* Further, Dougherty notes that he was calm and made appropriate eye contact while talking to the detectives and was forthcoming with information when asked questions. *Id.* Thus, Dougherty concludes that detectives did not have reasonable suspicion to conduct a *Terry* stop.

The court acknowledges that Dougherty is correct that the Get-N-Go was busy that night and other people were looking in the direction of the Get-N-Go. Additionally, although the detectives later discovered that Dougherty was not involved in the shooting at the Kum & Go, *see* Docket 38 at 47, 61, as the magistrate judge noted, "the fact that some circumstances may also be consistent with innocent activity does not preclude a finding of reasonable suspicion," Docket 41 at 14; *see also United States v. Stewart*, 631 F.3d 453, 457-58 (8th Cir. 2011); *United States v. Carpenter*, 462 F.3d 981, 986 (8th Cir. 2006) ("The behavior on

which reasonable suspicion is grounded . . . need not establish that the suspect is probably guilty of a crime or eliminate innocent interpretations of the circumstances."). Thus, while there are facts that weigh in favor of finding that the detectives did not have reasonable suspicion to detain Dougherty, based on the totality of the circumstances, the court concludes that such reasonable suspicion existed.

First, the court notes that the detectives located Dougherty at a gas station across the street from the Kum & Go soon after a fatal shooting was reported. *See* Docket 38 at 15. Second, Detective Leacraft testified that Dougherty's age and dress was consistent with individuals who were involved in "the months leading up to [the shooting at the Kum & Go, with] multiple weapons violations in gas station parking lots, or car meet-up situations where subjects had pulled guns or actually discharged them." *Id.* at 16; *see also United States v. Redman*, 39 F.4th 1030, 1033 (8th Cir. 2022) (recognizing that the totality of the circumstances includes the location of events and whether the events occurred in a high-crime area). Detective Leacraft also noted that Dougherty was wearing a puffy jacket and pants that he found "interesting" because it was a relatively warm night. Docket 38 at 15. Third, Detective Leacraft testified that when he asked Dougherty if he had seen anything, Dougherty said no but that he had been at the park and "ran" over to the Get-N-Go. *Id.* at 19; *see also* Docket 36-3 at 0:43-0:49. Detective Leacraft found it "odd" to be in a park given the time of night. Docket 38 at 19. Fourth, upon hearing Dougherty's full name, Detective Leacraft recognized Dougherty and remembered two incidents involving Dougherty's alleged firearm related crimes. *Id.* at 20-21; *see also United States v. Roelandt,* 827 F.3d 747, 748-49 (8th Cir. 2016)

18

(considering the officer's knowledge that the suspect was a prior felon and known to carry a firearm in assessing the reasonableness of the officer's suspicion); *Preston*, 685 F.3d at 690 (holding that a defendant's prior criminal cases involving domestic violence and firearms were relevant to the reasonable suspicion analysis despite the fact that the incidents arose three years prior). Based on the totality of these circumstances, the court finds that the detectives had reasonable suspicion to conduct a *Terry* stop on the basis that Dougherty may have been involved in the shooting at the Kum & Go. As such, Dougherty's objection is overruled.

### C.    Whether the Detectives Had Reasonable Suspicion to Conduct a Pat-Down of Dougherty's Person

"After a suspect is lawfully stopped, an officer may in some circumstances conduct a pat-down search for weapons." *United States v. Trogdon*, 789 F.3d 907, 910 (8th Cir. 2015). But "[a] protective frisk is only warranted if specific articulable facts taken together with rational inferences support the reasonable suspicion that a party was potentially armed and dangerous." *United States v. Cotton*, 782 F.3d 392, 396 (8th Cir. 2015) (internal quotation makes omitted). "The officer need not know for certain that the suspect is armed; instead, a search is permitted if a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Trogdon*, 789 F.3d at 910. This determination is also based on the totality of the circumstances and includes such factors as the "inferences and deductions made by officers under the particular circumstances." *United States v. Bailey*, 417 F.3d 873, 877 (8th Cir. 2005).

Dougherty argues that the factors cited in the Report and Recommendation do not support the conclusion that the detectives had reasonable suspicion to conduct a pat-down search of Dougherty's person. Docket 48 at 8. Here, however,

the court agrees with the magistrate judge that the detectives had reasonable suspicion to conduct a pat-down search. In addition to the factors identified to support reasonable suspicion for the *Terry* stop, the court also notes that once Detective Leacraft asked Dougherty if he could conduct a pat-down search, Dougherty did not verbally respond but instead began to take off his backpack. *See* Docket 36-3 at 1:06. At the same time, one of his hands drifted down his body. *Id.* While Dougherty argues that his hand did not move toward his waistband but instead was his attempt to put an item that was in his hand into his coat pocket, *see* Docket 48 at 8, Dougherty still made a downward motion toward his pocket that could lead a reasonable officer to believe that Dougherty was either hiding something or attempting to grab a concealed firearm, *see, e.g.*, *Bailey*, 417 F.3d at 877 (8th Cir. 2005) (holding that the defendant's "apparent attempt to conceal something provided [the officer] addition reason to suspect criminal activity"); *see also Stewart*, 631 F.3d at 458-59. Because it would be reasonable for an officer to believe that his safety or the safety of others was in danger based on the totality of the circumstances, *see Trogdon*, 789 F.3d at 910, the court finds that the detectives had reasonable suspicion to conduct a pat-down search of Dougherty. As such, Dougherty's objection is overruled.

## CONCLUSION

Based on the foregoing, it is ORDERED:

1.  That the Report and Recommendation (Docket 41) denying Dougherty's motion to suppress is adopted as modified by this opinion.

2.  That Dougherty's motion to suppress (Docket 28) is denied.

3.  That Dougherty's objections (Docket 48) are sustained in part and denied in part.

Dated February 17, 2026.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE